**Opinion issued December 22, 2016**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-16-00562-CV

————————————

**IN THE INTEREST OF D.E.B., T.A.B. III AKA T.B, JR., AKA T.J., JR., T.B. AKA BABY BOY W., CHILDREN**

---

**On Appeal from the 312th District Court**
**Harris County, Texas**
**Trial Court Case No. 2014-66511**

---

### MEMORANDUM OPINION

Following a bench trial, the trial court signed a judgment terminating the parent-child relationship between D.C.P. ("Mother") and three of her children. On appeal, Mother identifies five issues, asserting that the evidence was not legally or factually sufficient to support the trial court's judgment.

We affirm.

## Background

Mother is the biological mother of seven children. The three oldest children, Child 1, Child 2, and Child 3, were born in 2008, 2009, and 2010, respectively. [1] They have the same father, Father 1. Child 4 was born in 2012. Her father is Father 2. The three youngest children, Child 5, Child 6, and Child 7, were born in 2013, 2014, and 2015, respectively. Their father is Father 3.

On November 12, 2014, the Department of Family and Protective Services ("the Department") received a referral, alleging that Mother's boyfriend, Father 3, had physically abused Child 2 and Child 3. The referral stated that four-year-old Child 3 had "lash marks," welts, bruising, and "thin cuts" on many areas of his body, including his stomach, buttocks, and upper thigh. The referral stated that Child 3 had reported that Father 3 had hit him with a belt.

CPS caseworker Dawn Davis went to Mother's residence to check on the safety of the children. Mother and Father 3 were both there when Davis arrived. Davis later stated in an affidavit that she observed that Child 3 had "what appear[ed] to be lashes across his stomach area" that appeared to be "in different stages of healing." Davis stated that it appeared that Child 3 had been "struck over and over again." Davis also indicated that Child 3 had bruising on his thigh. Mother would not allow Davis to interview Child 3 privately.

---

[1]     Because a number of Mother's children have the same initials, we will refer to each child by the pseudonym "Child" and his or her corresponding birth order.

Mother told Davis that she had noticed marks on Child 3's stomach when she had bathed him on November 9, 2014. Mother stated that Child 3 told her that he had gotten the marks while playing with his cousins at a birthday party. Father 3 told Davis that Child 3 had told him that he had gotten the marks when he fell.

Davis also saw Child 2 during her visit and noted that she saw no marks on him. Mother also refused to allow Davis to interview Child 2 privately.

Davis further stated that Mother and Father 3 were "uncooperative during the interview" and that their answers to her questions appeared to be "untruthful." Davis noted that Mother stated that she had only four children when she actually had six children.

In her affidavit, Davis reported that, when she asked him about his criminal history, Father 3 told her that he had "a possession charge 8 years ago." Davis stated that Father 3 "actually . . . has [a] very extensive criminal history," including theft, assault, evading arrest, and other drug-possession charges.

Davis also testified in her affidavit that Mother told her that she had no CPS history; however, this was not true. Mother had been referred to CPS in September 2013 when a caregiver for the children reported that Child 3 had scratches on his face. Child 3 had told the caregiver that Father 3 had hit him in the face with a belt and a shoe. The caregiver also had noticed a bruise on the inside of Child 2's thigh. Child 2 told the caregiver that Father 3 had touched his "private parts."

Davis noted in her affidavit that the 2013 CPS referral had been administratively closed when another referral regarding the children was received in September 2014. At that time, CPS had been notified that Mother had tested positive for marijuana when Child 6 was born. Davis noted that the September 2014 referral had also indicated that Father 3 was "an avid marijuana user."

The Department filed suit, requesting the trial court to issue temporary orders appointing the Department as the temporary sole managing conservator of Child 4, Child 5, and Child 6. An agreement was reached that Child 1, Child 2, and Child 3 would reside with their father, Father 1. The Department's petition indicated that, if family reunification could not be achieved, the Department sought to terminate Mother's parental rights to Child 4, Child 5, and Child 6. Father 2 and Father 3 were also named in the petition.

The Department offered Davis's affidavit in support of the petition. Davis concluded her affidavit by asserting, "There is an immediate concern for the children" . . . "due to the severity of the injuries on 4-year-old [Child 3] . . . as well as the drug use and the inconsistency of statements by [Father 3] and [Mother]." Davis also stated that "[Mother] has had an open CPS case for 2 years and has not completed her services."

On November 13, 2014, the trial court appointed the Department as the temporary managing conservator of the three children. Child 4 was placed in the

home of her paternal grandparents. Child 5 and Child 6, who have a different father than Child 4, were placed together in a foster home.

The trial court held a status hearing on January 29, 2015, at which Mother appeared. Following the hearing, the trial court signed an order approving a family service plan for Mother. The plan set out several tasks and services for Mother to complete before she would be reunited with her children. The service plan required Mother to complete the following tasks and services: (1) provide her caseworker with updated contact information; (2) "maintain a stable and child friendly home"; (3) participate in a parenting class; (4) maintain stable employment for six months and provide documentation of employment; (5) attend visits with her children, court dates, and conferences; (6) "live a drug free lifestyle, which entails no longer using illegal substances . . . ."; (7) submit to random drug testing; (8) permit the assigned caseworker to conduct home visits; (8) participate in a psychosocial evaluation; and (9) complete a drug and alcohol assessment and "follow any and all recommendations made by the service provider."

Pursuant to the service plan, Mother completed the required substance abuse assessment in April 2015. Based on the evaluation, the service provider recommended that Mother undergo outpatient drug treatment. Mother also completed a psychosocial evaluation in May 2015. Following the evaluation, the service provider recommended that Mother engage in individual counseling.

5

The trial court held permanency hearings in May 2015 and in September 2015. At the September hearing, Mother represented to the trial court that she was not pregnant, even though she had been posting on social media that she was pregnant. The trial court ordered Mother to undergo drug screening and to submit to a pregnancy test. Mother submitted to drug and pregnancy testing on October 14, 2015. The testing showed that Mother was pregnant and that she was positive for cocaine and marijuana.

Mother gave birth to Child 7 in December 2015. Mother retained custody of child 7, however, a separate legal action was initiated regarding the infant. In January 2016, the court presiding over the action involving Child 7 signed a temporary order, enjoining Mother from allowing any contact between Child 7 and his father, Father 3. However, Mother did not abide by that order. Mother permitted contact between Father 3 and Child 7 on February 12, 2016 and on March 4, 2016.

The instant case was tried to the bench, beginning May 9, 2016. At trial, the Department sought to terminate the parent-child relationship between Mother and Child 4, Child 5, and Child 6 and between the children and their respective fathers, Father 2 and Father 3.

At trial, the Department demonstrated that Mother had not satisfied the requirements of her family service plan, which was admitted into evidence. Sarah

Allen, the Department caseworker assigned to the case, testified that Mother had not complied with her service plan for the following reasons: (1) Mother tested positive for marijuana and cocaine while the case was pending; (2) she did not attend the recommended outpatient drug treatment; (3) she did not complete the recommended individual psychological therapy; (4) she did not maintain stable employment for six months; and (5) she missed six scheduled visits with her children.

Among Allen's concerns regarding the children were Mother's drug use and her failure to undergo recommended treatment for her substance abuse. The evidence showed that Mother tested positive for cocaine and marijuana in October 2015, while she was pregnant with Child 7. The evidence also showed that Mother had tested positive for marijuana at the time of the births of two of her other children.

Allen also expressed concern regarding Mother's continued association with Father 3, who had reportedly physically abused Child 3. The Department offered into evidence pictures of Child 3 showing the lash marks, cuts, welts, and bruises on his body. Allen testified that Mother had permitted Father 3 to have contact with Child 7 in contravention of the January 2016 court order, enjoining Mother from allowing Father 3 to have contact with Child 7. Allen testified that Mother also lied to her about Mother's contact with Father 3. In early February 2016,

7

Allen had asked Mother if she remained in contact with Father 3, and Mother had told her she did not. However, the following week, Allen saw Father 3 give Mother a ride to a scheduled visitation with her children. Allen saw Father 3 give Mother and Child 7 another ride to visitation on March 4, 2016.

Mother testified at trial that she no longer had any relationship with Father 3, and had not seen him since March 4. She admitted that Father 3 had given her a ride to the visitations in February and March. She claimed that she had no other transportation to the visits. Mother also indicated that she no longer engaged in drug use. The defense pointed out that Mother had only one positive drug screening during the pendency of the case, in October 2015, when she tested positive for cocaine and marijuana. Mother admitted to smoking marijuana in the past but denied that she ever used cocaine. She claimed that she had tested positive for cocaine in October 2015 because a friend with whom she was living at that time smoked marijuana laced with cocaine.

Mother also admitted that she had not been truthful with the trial court in September 2015 when she said that she was not pregnant. She testified that she had lied because she did not want the Department to take Child 7 away from her after he was born.

Mother further testified that she was employed in the internet sales department of a car dealership. She stated that she had worked at the dealership

since March 28, 2016. However, following Mother's testimony, the Department presented the testimony of a representative of the dealership who stated that Mother's employment had been terminated in early April after she had worked at the dealership for only one week.

The Department also presented evidence showing that Child 4 was bonded with her paternal grandparents with whom she was living. The evidence also showed that she was a happy and healthy child and that her grandparents wished to adopt her. The Department further showed that Child 5 and Child 6 were placed together in a foster home. They were also doing well and had bonded with the foster parents, who wished to adopt them.

At the conclusion of trial, the court granted the Department's request for termination of the parent-child relationship between Mother and Child 4, Child 5, and Child 6. On June 30, 2016, the trial court rendered judgment terminating Mother's parental rights, finding that termination was in the children's best interest and that Mother had engaged in the predicate acts listed in Family Code Subsections 161.001(b)(1)(D),(E),(N), and (O). Specifically, the trial court found that clear and convincing evidence showed (1) Mother had knowingly placed or allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being (Subsection (D)); (2) Mother had engaged in conduct or knowingly placed the children with persons who engaged in conduct

that endangered their physical or emotional well-being (Subsection (E)); (3) Mother had constructively abandoned the children (Subsection (N)); and (4) Mother had failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children (Subsection (O)). The trial court also terminated the parent-child relationship between Father 2 and Child 4 and between Father 3 and Child 5 and Child 6. The judgment also appointed the Department as the children's sole managing conservator.

Mother now appeals the trial court's judgment.[2]

## Sufficiency of the Evidence

Mother identifies five issues, addressing the legal and factual sufficiency of the evidence (1) to support the trial court's predicate findings and (2) to support the trial court's determination that termination was in the children's best interest.

## A. Standard of Review

Termination of parental rights requires proof by clear and convincing evidence. *See* TEX. FAM. CODE ANN. 161.001(b) (Vernon Supp. 2016). The Family Code defines clear and convincing evidence as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN.

---

[2] Neither Father 2 nor Father 3 have appealed.

§ 101.007 (Vernon 2014); *see In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2003). Here, the Department was required to establish, by clear and convincing evidence, that Mother's actions satisfied one of the predicate grounds listed in Family Code section 161.001(b)(1) and that termination was in the children's best interest. *See* TEX. FAM. CODE ANN. 161.001(b)(1), (2).

When determining legal sufficiency, we review all the evidence in the light most favorable to the trial court's finding "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *J.F.C.,* 96 S.W.3d at 266. To give appropriate deference to the fact finder's conclusions, we must assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so. *Id.* We disregard all evidence that a reasonable fact finder could have disbelieved or found to have been not credible. *Id.* This does not mean that we must disregard all evidence that does not support the finding. *Id.* The disregard of undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence. *Id.* Therefore, in conducting a legal-sufficiency review in a parental-termination case, we must consider all of the evidence, not only that which favors the verdict. *See City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005).

In determining a factual-sufficiency point, the higher burden of proof in termination cases also alters the appellate standard of review. *In re C.H.*, 89

S.W.3d 17, 25–26 (Tex. 2002). "[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." *Id.* at 25. In considering whether evidence rises to the level of being clear and convincing, we must consider whether the evidence is sufficient to reasonably form in the mind of the fact finder a firm belief or conviction as to the truth of the allegation sought to be established. *Id.* We consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

We give due deference to the fact finder's findings, and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109.

**B.    Predicate Acts**

"Only one predicate finding" under section 161.001(b)(1) "is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). Here, in

her first three issues, Mother challenges the legal and factual sufficiency of the evidence to support the predicate acts of endangerment and constructive abandonment. *See* TEX. FAM. CODE ANN. §§ 161.001(b)(1)(D), (E), (N). However, in her fourth issue, Mother concedes that the evidence is legally and factually sufficient to support the trial court's finding that she failed to comply with her court-ordered service plan. *See id.* § 161.001(b)(1)(O). We agree.

As discussed in the background section above, the Department presented evidence showing that Mother failed to complete significant requirements identified in her court-ordered service plan, including completing outpatient drug treatment and individual counseling; maintaining employment for a six-month period; attending scheduled visitation with her children; and abstaining from illegal drug use and living a drug-free lifestyle. And, when asked at trial, Mother admitted that she had not satisfied all of the requirements of her service plan. Because Mother concedes that at least one predicate finding is supported by legally and factually sufficient evidence, we not need not address her first three issues, challenging the sufficiency of the evidence to support the other predicate findings. *See* TEX. R. APP. P. 47.1.

## C.    Best-Interest Finding

In her fifth issue, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of the parent-child relationship was in the children's best interest.

### 1.    *Legal Standards*

There is a strong presumption that the best interest of the child will be served by preserving the parent–child relationship.  *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).  Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest.  TEX. FAM. CODE ANN. § 263.307(a) (Vernon Supp. 2016).

The Supreme Court of Texas has identified factors that courts may consider when determining the best interest of the child, including: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individual seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent–child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent.  *Holley v. Adams*, 544 S.W.2d 367,

371–72 (Tex. 1976). This is not an exhaustive list, and a court need not have evidence on every element listed in order to make a valid finding as to the child's best interest. *C.H.*, 89 S.W.3d at 27. While no one factor is controlling, analysis of a single factor may be adequate in a particular factual situation to support a finding that termination is in the best interest of the child. *In re A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.).

In addition, the Texas Family Code sets out thirteen factors to be considered in evaluating a parent's willingness and ability to provide the child with a safe environment. *See* TEX. FAM. CODE ANN. § 263.307(b). These factors are as follows:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

15

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

> (A) minimally adequate health and nutritional care;
>
> (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;
>
> (C) guidance and supervision consistent with the child's safety;
>
> (D) a safe physical home environment;
>
> (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and
>
> (F) an understanding of the child's needs and capabilities; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

*Id.*

The evidence supporting the statutory predicate grounds for termination may also be used to support a finding that the best interest of the child warrants

termination of the parent–child relationship. *C.H.*, 89 S.W.3d at 28; *In re H.D.*, No. 01–12–00007–CV, 2013 WL 1928799, at *13 (Tex. App.—Houston [1st Dist.] May 9, 2013, no pet.) (mem. op.). Furthermore, in conducting the best-interest analysis, a court may consider not only direct evidence but also may consider circumstantial evidence, subjective factors, and the totality of the evidence. *H.D.*, 2013 WL 1928799, at *13.

### 2. *Analysis*

Multiple factors support the trial court's determination that termination of Mother's parental rights was in the children's best interest. The trial court heard evidence that Mother had a history of illegal drug use for which she failed to receive treatment as required by her court-ordered service plan. The evidence showed that Mother had tested positive for marijuana at the birth of two of her children, indicating that she had ingested marijuana during those pregnancies. In addition, Mother tested positive during the pendency of this case for marijuana and for cocaine. At the time of the positive test, Mother was pregnant with Child 7. Based on her court-ordered drug evaluation, Mother was referred to outpatient drug treatment; however, the evidence showed that she never attended drug treatment.

At trial, Mother pointed out that only one of her drug tests during the pendency of the case was positive; all the rest were negative. Mother asserted that

her one positive drug test was not a result of her own drug use; rather, she claimed that it resulted from her exposure to her roommate's use of marijuana laced with cocaine. In other words, Mother admitted that she did not live a drug free lifestyle; instead, she knowingly lived with a person who used illegal drugs while she was pregnant with Child 7. Further, caseworker Allen testified that, in her experience, it is not uncommon for parents who abuse drugs to have periods of abstinence from drug use and then relapse.

Parental drug abuse reflects poor judgment and may be a factor to be considered in determining a child's best interest. *See* TEX. FAM. CODE ANN. § 263.307(b)(8) (providing that courts may consider whether there is history of substance abuse by child's family). A parent's drug use is indicative of instability in the home environment because it exposes the children to the possibility that the parent may be impaired or imprisoned. *See P.W. v. Dep't of Family & Protective Servs.*, 403 S.W.3d 471, 479 (Tex. App.—Houston [1st Dist.] 2013, pet. dism'd w.o.j.); *see also Holley*, 544 S.W.2d at 371–72 (factor seven: stability of the home). Evidence relating to Mother's drug use also supported the trial court's best interest finding under the following factors: the children's emotional and physical needs now and in the future; emotional and physical danger to the children now and in the future; acts or omissions indicating that the existing parent-child relationship is not a proper one; and excuses by Mother for her drug use and

18

exposing her unborn children to drugs. *See Holley*, 544 S.W.2d at 371–72 (factors two, three, eight, and nine). The evidence further supported an inference that Mother's pattern of illegal drug use would continue as it had in the past. *See* TEX. FAM. CODE ANN. § 263.307(b)(3), (8), (10) (providing that, in determining best interest, courts may consider magnitude, frequency, and circumstances of harm to child; parent's history of substance abuse; and parent's willingness to seek out and complete counseling services and cooperate with appropriate agency). In making the best-interest determination, courts may consider the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time. *See id.* § 263.307(b)(11). Moreover, a factfinder may infer from a parent's failure to take the initiative to complete the services required to regain possession of her children that she does not have the ability to motivate herself to seek out available resources needed now or in the future. *In re J.M.*, No. 01–14–00826–CV, 2015 WL 1020316, at *7 (Tex. App.—Houston [1st Dist.] Mar. 5, 2015, no pet.) (mem. op.); *see also Holley*, 544 S.W.2d at 371–72 (factor five: programs available to assist parent).

The evidence also showed that Mother continued to associate with Father 3 during the pendency of the case, even though his reported physical abuse of Child 3 had prompted the removal of her children from her custody and the filing of this case. The evidence also showed that Mother permitted Father 3 to have contact

19

with Child 7 on two occasions in violation of a court order. This evidence supports the trial court's best interest finding under the following factors: the emotional and physical needs of the child now and in the future; the emotional and physical danger to the child now and in the future; and the parental abilities of the individual seeking custody. *See Holley*, 544 S.W.2d at 371–72 (factors two, three, and four); *see also* TEX. FAM. CODE ANN. § 263.307(b)(7), (12)(D)–(E) (providing that, in determining best interest, courts may consider whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home and whether adequate parenting skills are demonstrated by providing the child with a safe physical home environment and protection from repeated exposure to violence).

In addition, the evidence indicated that Mother did not have a stable income or a history of stable housing. Mother testified that, when the case began, she was working in a sales position for an energy company selling electricity. She averred that the job provided a good income. Mother claimed that the Department had required her to quit the sales job in April 2015, after this case began, because the job required her to travel. She testified that she worked for an agency cleaning houses from May 2015 until July 2015. Mother was then unemployed until March 2016 when she was hired by a car dealership. When asked whether she considered her employment history to be stable she responded, "No."

In addition, the Department presented evidence from which the trial court could have inferred that Mother was not being truthful about her current employment status. At the May 2016 trial, Mother testified that she was currently employed at the car dealership. However, the Department presented a representative from the dealership who testified that Mother was not currently employed at the dealership. The representative stated that Mother had been terminated only one week after she was hired.

Mother also testified that she had lived in four different locations in the previous year. When asked on cross-examination whether she considered that to be "stable housing," Mother responded that it was not stable. "A parent who lacks stability, income, and a home is unable to provide for a child's emotional and physical needs." *In re J.R.W.*, No. 14–12–00850–CV, 2013 WL 507325, at *9 (Tex. App.—Houston [14th Dist.] Feb. 12, 2013, pet. denied) (mem. op.). The evidence regarding Mother's housing and employment history supported the trial court's best interest finding under the following factors: the emotional and physical needs of the child now and in the future and the stability of the home or proposed placement. *See Holley*, 544 S.W.2d at 371–72 (factors two and seven).

Other evidence was also presented relevant to the following factors: the emotional and physical needs of the children now and in the future, the parental abilities of those seeking custody, and the plans for the children by those seeking

custody.  *See Holley*, 544 S.W.2d at 371–72 (factors two, four, six); *see also* TEX. FAM. CODE ANN. § 263.307(b)(12) (providing that court may consider whether child's family demonstrates adequate parenting skills).  The evidence showed that the three children were currently placed in homes that were safe, stable, and met all of the children's physical and emotional needs.  *See In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (stating that stability and permanence are important to upbringing of a child and affirming finding that termination was in child's best interest when child was thriving in foster care); *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (considering child's bond with foster family in reviewing best-interest determination).

Meredith Wallace, the child advocate assigned to the case, testified that Child 4 had been placed with her paternal grandparents with whom she is bonded. Wallace indicated that the grandparents wish to adopt Child 4 and that they are meeting Child 4's physical and emotional needs.  She stated that Child 4 is being raised with another child-relative her own age.  Wallace indicated that Child 4 is happy and healthy living with her grandparents.

Wallace also testified that Child 5 and Child 6 are "thriving," "happy," "and doing really well" in their foster placement.  Wallace also stated that the children are bonded with their foster parents, who wish to adopt them.  She confirmed that

the foster parents are meeting the children's physical and emotional needs. Wallace also testified that, when they came into foster care, the children's social skills were delayed, but now they are interacting well with others. She also indicated that Child 6 had severe allergy issues when he came into foster care, which have now been successfully treated.

Mother points out that evidence was presented weighing against the best interest finding. She points to evidence showing that she had lived in the same apartment for the past seven months before trial, indicating stability. However, the Department's witnesses testified that they were concerned about Mother's living situation because she could not provide a lease for the apartment. Mother claimed that she was subletting the apartment from a friend who was the leaseholder. The Department questioned the stability of the leasing arrangement.

Mother claims in her brief that the evidence also showed that she is "doing her best to complete her services." The evidence did show that Mother had completed some of the requirements of her service plan, such as completing parenting classes. However, as discussed, Mother failed to complete a number of the significant services required in the service plan, such as attending drug treatment and maintaining employment. In addition, Mother admitted at trial that she violated the court order, enjoining her from allowing Father 3 to have contact

23

with her youngest child, and she admitted that she had lied to the trial court in the past.

Mother further points to evidence showing that she was bonded with her children and that Child 4 "interacts well" with her. She also cites Allen's testimony indicating that Mother was "very focused and very hands-on" during her scheduled visits with Child 5 and Child 6.

Mother correctly points out that some evidence exists in the record weighing against the trial court's finding that termination was in the children's best interest. However, evidence cannot be read in isolation; it must be read in the context of the entire record. *See In the Interest of K.C.F.*, No. 01–13–01078–CV, 2014 WL 2538624, at *16 (Tex. App.—Houston [1st Dist.] June 5, 2014, no pet.) (mem. op.). The record reveals that Mother has a history of providing an unstable home for her children, where they have been subjected to illegal drug use and reported physical abuse. The record also shows that Mother did not take the necessary steps to remedy the instability of her home while this case was pending, even though she was offered services to assist her. As the factfinder, the trial court, after assessing the credibility of the witnesses and weighing the evidence, could have reasonably inferred that Mother would continue her pattern and practice of providing an unstable home for her children, which has the potential to compromise their emotional and physical well-being.

After viewing all of the evidence in the light most favorable to the best-interest finding, we conclude that the evidence was sufficiently clear and convincing that a reasonable factfinder could have formed a firm belief or conviction that termination of the parent-child relationship between Mother and Child 4, Child 5, and Child 6 was in the children's best interest. We further conclude that, viewed in light of the entire record, any disputed evidence could have been reconciled in favor of the trial court's finding that termination of the parent-child relationship between Mother and the children was in the children's best interest or was not so significant that the trial court could not reasonably have formed a firm belief or conviction that termination was in the children's best interest. Therefore, after considering the relevant factors under the appropriate standards of review, we hold the evidence is legally and factually sufficient to support the trial court's finding that termination of the parent-child relationship was in the children's best interest.

We overrule Mother's fifth issue.

## Conclusion

We affirm the judgment of the trial court.

Laura Carter Higley
Justice

Panel consists of Justices Keyes, Higley, and Lloyd.